Filed 8/9/21; Certified for Partial Publication 9/1/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DALE DUNCAN et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>ANNE KIHAGI et al.,<br><br>    Defendants and Appellants. | A153521<br><br>(City and County of San Francisco  Super. Ct. No. CGC-15-545655) |

Respondents Dale Duncan and Marta Munoz Mendoza sued their former landlords for wrongful eviction and harassment after they were forced from their longtime San Francisco apartment.  A jury found in their favor and awarded them damages that totaled $3,528,000 after trebling, which the trial court later reduced to $2.7 million.  The landlords appealed, and respondents cross-appealed to challenge the amended and reduced judgment. We affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Duncan moved into a two-bedroom unit in a five-unit building on Hill Street in San Francisco in early 1994.  Under his lease, he was responsible for gas and electric, and the landlord was responsible for water and garbage services.  He had access to a parking space behind the building, and soon

1

after he moved in he was also given access to a storage space where he could keep his bicycle and other items. Duncan's wife Mendoza moved into the unit in 2010, and they lived together with their daughter. Duncan never missed a rent payment and was never late with his rent.

Duncan's unit was subject to San Francisco's rent-control ordinance, meaning his rent could be raised a maximum of around 1.9 percent per year and in fact was raised around 1.5 percent per year. During his tenancy, the maximum that stabilized rent could be increased was a total of 31 percent, whereas the market rent for a two-bedroom, one-bath unit in San Francisco increased by 254 percent.

In late May 2014, Duncan was informed that the building was going to be sold. At that time, he was paying $1,261.85 in monthly rent. Appellant Zoriall LLC purchased the building for $2.5 million. Appellants Anne Kihagi and Christina Mwangi are members of Zoriall, with Mwangi holding a 27 percent interest in the LLC. We sometimes refer collectively to appellants as "the landlords."

On August 1, the day the first rent payment to the new owner was due, Duncan received a letter placed under his door. The letter was from Zoriall and stated the building was under new ownership as of June 26, 2014, with Kihagi[1] as the primary contact. The letter provided an address for Zoriall where future rent payments should be sent. According to the letter, all terms of Duncan's rental agreement would remain the same, with the exception of "the changes in the separate notice change of terms with the same date." No separate notice, however, was included.

---

[1] The letter actually referred to Anna Swain, another name Kihagi goes by. Although she is sometimes referred to in the record as Swain, we refer to her as Kihagi throughout this opinion.

2

Almost immediately, and for the next 14 months until Duncan and his family were forced to rent a new apartment, the landlords took away various benefits that had previously been provided to the tenants, ignored or delayed responding to maintenance and upkeep issues, were uncommunicative and uncooperative, and became increasingly hostile. One of the first things Duncan noticed was that one of the building's two recycling bins was removed, and recycling materials started "spilling over everywhere."

Duncan soon received additional notices slipped under his door. On August 10, he received a 30-day-notice of change of tenancy, which related to attorney fees. It provided that in the event of action to enforce terms of the rental agreement, each party shall bear their own attorney fees and costs. A few days later, Duncan received a packet of house rules, and the document stated that tenants would be deemed to have accepted the rules by staying in their units and continuing to pay rent. Duncan "was kind of freaked out" because the agreement "felt kind of forceful." One of the new rules required tenants to replenish the amount of their original security deposit (Duncan's was $1,275), which struck Duncan as "kind of weird." Duncan was told he would be responsible for his own garbage service and tenants would not be allowed to store items anywhere except in their rental units or other areas designated by the landlord. Duncan contacted a tenant's rights group and was reassured that he would not be agreeing to all the new rules simply by making his next rent payment.

Duncan experienced an escalating series of problems with the landlords. He called Kihagi to tell her about a notice from the City of San Francisco (City) regarding necessary repairs to the sidewalks outside the building. He raised the possibility of partnering with Friends of the Urban Forest to add a garden box when the repairs were done. Kihagi kept

3

interrupting Duncan, sounded like she did not want to talk, and then announced, "I'm not spending any damn money on maintenance for the building."

In mid-September 2014, Duncan called Kihagi again, this time to report that his water heater was leaking. The two spoke briefly, and Kihagi said that Duncan should text her and not call. Duncan texted her, but she did not respond, so Duncan wrote a letter about it and included it with his October rent payment. Water pooled on the floor, and Duncan put towels and a bucket under it and checked with his downstairs neighbor to ask whether water was leaking onto the neighbor's ceiling. In his letter, Duncan also mentioned that the washer and dryer were not operational because their coin boxes were full. After not hearing a response for another two weeks, Duncan contacted the City's building department. Someone at the building department said they would call Kihagi, and within a few days two workers showed up "out of the blue" to fix the water heater. Kihagi never responded to his concerns about the laundry machines, so for a while Duncan took it upon himself to call the phone number identified on the machines to ask for the coin boxes to be emptied.

Also that fall, power that lighted outside common areas of the building went out. A separate meter controlled the power to those areas. Duncan texted Kihagi about the outage and provided the meter number, but Kihagi replied that "there was no meter" and that she "had been working with PG&E for months to figure it out." Duncan "immediately . . . knew she was lying because [he] had already called PG&E and . . . knew what the problem was." For a week the building lacked lighting on the exterior of the building and in the laundry area, and Duncan considered it "very unsafe" for his family when they entered and left the building in the evening because the

4

stairs were unlit.  He contacted the City's Department of Building Inspection about the power being out because, after his experience with the water heater, he believed this would be the only way to get the power restored.

On another occasion, a service person with the City's water department came to shut off water to the building because Kihagi had not opened an account in the three months since she took ownership of the building. Duncan "totally freaked out" and asked the worker to hold off, and the worker promised to do so for a few days.  Duncan texted Kihagi, and this time the issue was resolved without the utility being shut off.

On yet another occasion, the tenants were told to remove bicycles and other items from the garage.  At the same time, they were told that the locks on the building mailboxes were changed, but for a month they were not provided with new keys.  Although the tenants could access their mail for most of this time because the master lock was unlocked, for about four days they could not get their mail.  Mwangi finally brought the keys to the property and left Duncan's on the porch.

In January 2015, PG&E sent a letter to the tenants telling them that the landlords had missed payment and service would be discontinued unless the full past-due amount was paid.  A short time later, the power went off for a second time.  Duncan texted Kihagi about the problem, and this time she took care of it.

Duncan discovered that Kihagi owned other properties and learned that she owned a multi-unit building in San Francisco's North Beach neighborhood as well as buildings in Los Angeles.  He communicated with the tenants in his own building about the problems they were having.  Duncan attended a protest against Kihagi in January 2015, which he learned about on Facebook, and he met tenants in other properties owned by Kihagi.

In February 2015, the code enforcement division of the City Attorney's Office wrote to the tenants asking to inspect the property on March 4 to determine if the building was in compliance with state and local codes. It planned to conduct a "task force inspection," which is undertaken when a property has come to the City's attention and multiple agencies may need to address issues. Duncan, Mendoza, and another building resident stayed home and were waiting for inspectors to arrive when they saw Kihagi and "some black clothe[d] security people" park across the driveway and stand in front of the building's walkway "as if they were going to block the access." After City personnel arrived and "big beefy security guards" tried to block access to the building, Duncan and other tenants went downstairs and invited the inspectors inside. An investigator from the City Attorney's office was there, along with a housing inspector, a building inspector, a plumbing inspector, and an electrical inspector. One inspector was "really concerned" about Duncan's water heater because it was not up to earthquake code, and he issued "a rush violation" and said it needed to be repaired immediately.

While the inspectors were in Duncan's unit, Kihagi appeared upset and at one point held up a camera phone to Duncan and said, "I look forward to getting to know you better, Dale." Duncan considered her comment to be unpleasant and harassing, and he believed Kihagi was blaming him for having the inspectors in the building, even though he had not called them there. The security guards also filmed the tenants in a manner that was "in your face" and intimidating to the tenants. At one point, Duncan opened a door to a staircase leading to the garage and saw a man who told Duncan, "You're not coming down here" and prevented him from taking inspectors downstairs. During the inspection, Kihagi mentioned that she planned to move her sister (Mwangi) into one of the building's units.

About 45 minutes after the inspection team left, a truck pulled up and workers proceeded to build a wall blocking access to the laundry area. Workers also changed the garage lock, which further prevented the tenants from accessing the area for laundry, bicycle parking, and storage. Duncan went downstairs to take a picture of a worker, but the worker screamed expletives at Duncan to get away. Kihagi returned at the end of the day to make sure the work had been done. The Department of Building Inspection issued a notice of violation after its inspection.

Duncan complained to the San Francisco Rent Board that access to the laundry area was removed without just cause, and he also wrote to Kihagi memorializing what had happened on March 4 and other negative communications he had had with her. He was relieved when the Rent Board wrote to Kihagi stating she failed to meet the just-cause requirement to remove a housing service, but he was disappointed he still lacked access to the laundry area.

Duncan and other building tenants learned in March that a 27 percent interest in the building had been transferred that month from Zoriall to Mwangi.

On March 20, Duncan came home and saw a tow truck trying to back down the driveway with another tenant's car, and he called police. Police arrived, and Kihagi arrived shortly thereafter. Duncan told police that Kihagi was towing his neighbor's car out of the garage and he wanted to make sure someone saw it "so they didn't think we were making things up." Kihagi told police that she needed to park her car in the spot. After police left, the car was towed, and then workers removed laundry machines from the building and boarded up the door to the laundry and storage area.

Duncan wrote to Kihagi to ask why access to laundry and storage had been removed, but he did not receive a response.

In March and April 2015, Duncan and Mendoza received at their door a series of 24-hour notices of intent to enter their unit to conduct repairs. The notices often provided long windows of possible entry (such as between 9:00 a.m. and 4:00 p.m.). Sometimes the notices did not provide a full 24 hours of notice, and sometimes no one would arrive on the dates provided.

Duncan, Mendoza, and other residents of the building formed a tenants union and wrote to Kihagi in early April informing her that they had done so. In mid-April, a couple moved out of the unit that Kihagi had said she planned to have Mwangi occupy. The tenants union wrote to Kihagi and said that an owner move-in into any other of the remaining occupied units would be in bad faith.

In mid-April, Duncan filed a notice of wrongful eviction with the Rent Board because he felt harassed and was concerned Kihagi would try to evict him. The next day, Mwangi served Duncan and Mendoza with a 60-day notice of termination of tenancy as an owner move-in, based on her 27 percent ownership interest in the property. The notice referred to Mwangi as an owner and landlord who sought to recover possession of the tenants' unit. The notice further stated that Mwangi's current principal place of residence was a rental unit located on 18th Street in San Francisco, that she also owned a single-family home where her mother lived in Fremont, and that she owned less than a five-percent interest in a real estate company that owned a two-unit apartment building on 26th Street in San Francisco. The notice acknowledged the recently vacated unit but stated it was too large for Mwangi and "lack[ed] charm and aesthetic potential" as compared to Duncan and Mendoza's unit, which she preferred. The notice stated that the recently

8

vacated unit would not be available to rent for four to five months, and it was not offered to Duncan and Mendoza.  Duncan felt as if he "had been punched in the stomach."  He and his family did not move out at the end of 60 days because they "didn't have a place to go."

In May 2015, Duncan and Mendoza brought this suit against the landlords for various causes of action, including violation of San Francisco's Residential Rent Stabilization and Arbitration Ordinance (Rent Ordinance) (S.F. Admin. Code ch. 37, hereafter Admin. Code).

Around this time, the City also sued Kihagi, Mwangi, Zoriall, as well as other LLCs connected to Kihagi, for tenant harassment and violations of various codes.  (*City and County of San Francisco et al. v. Kihagi et al.* (Super. Ct. S.F. City and County, 2015, No. CGC-15-546152).)  Following a court trial in that separate action, the court issued a 151-page statement of decision in May 2017 against the defendants.  That decision was on appeal when trial began in this action.  (*City and County of San Francisco v. Kihagi*, No. A151719.)  We sometimes refer to the action involving the City as "the City's lawsuit."

In June 2015, eviction efforts continued against Duncan and Mendoza. Zoriall served Duncan and Mendoza with a three-day notice to cure or quit based on alleged violations of their original 1994 rental agreement.  The notice included several false allegations against Duncan, such as that he was operating a commercial business without a license, that he complained to the press about broken windows that he himself had damaged, and that he misled building inspectors.  Included with the notice was a letter from Zoriall dated October 16, 2014, which Duncan did not see until he received the three-day notice to quit.  The letter falsely stated that Duncan had not been allowed by the previous landlord to store items on the ground level and that

he had "forcibly" taken a parking slot without the previous landlord's permission, and that Zoriall had notified Duncan to remove his items from the storage area. Duncan "felt horrible" when he received the notice because he "was already being evicted to begin with, and then she's evicting me again with all this stuff that's just, like, made up." The landlords ultimately filed two separate unlawful detainer actions against Duncan and Mendoza.

Duncan and his family moved out of the Hill Street building at the end of August 2015. They rented a two-bedroom, one-bathroom house in a different San Francisco neighborhood for $3,250 a month, an increase of nearly $2,000 (or triple) over what they had paid for their unit on Hill Street. The landlords did not return Duncan's security deposit. Soon after Duncan and his family moved out, Mwangi's interest in the building was transferred back to Zoriall.

Duncan frequently returned to the neighborhood because he had many connections there, and he would drive by the building on his way to work. His unit appeared empty for the first six months after he moved out, and then he started to see work being done in the unit for about a year. Duncan did not see any signs of anyone moving into the unit before blinds were installed about 14 months after he moved out, at which point he could no longer see inside the unit.

When asked at trial whether she had moved into the tenants' former unit by the end of November 2015 as she had represented in the move-in notice, Mwangi testified that the move did not take place until September 2016 to allow time to renovate the unit. She acknowledged that she did not seek an extension of time to move in even though her move-in notice said she would seek an extension if one was necessary.

Around a year after Duncan moved out, Kihagi falsely accused Duncan of stealing from her. She texted him, "Dale, we hope you will smile for the cameras when trespass on our property. We have again been robbed for carpentry and construction items, and promise you received at 1051. We promise you next time will not be as easy and will seek to prosecute to the fullest. Otherwise best wishes with your new home." Duncan "just felt like, wow, this woman is still hassling me and I've been out of the house for a year." He testified that Kihagi's harassment was a "major life crisis" that affected his entire family. The day Duncan testified at trial, his daughter threw up before school and asked, "Why are we still dealing with Kihagi?"

A jury trial began in August 2017. Mwangi testified that she lived at the Hill Street property. She described the property as "a beautiful Victorian building in a historic neighborhood" that features "a lot of really nice restaurants and coffee shops that you can walk to." Mwangi testified at her deposition that she did not go inside the unit until she moved in, but she testified at trial that she "[t]ook a look at the unit" before she moved in, while workers were there. At her April 2016 deposition she acknowledged that the address of the Fremont house was listed on her driver's license, and at trial in July 2014 she acknowledged that she had signed loan refinancing documents stating the Fremont home would be her principal residence for at least one year. She further acknowledged at trial that on the day before initiating the move-in proceeding she re-signed the Fremont property's deed of trust, which contained a statement that it was her principal place of residence.

The jury returned verdicts for Duncan and Mendoza. Jurors found that Mwangi, Kihagi, and Zoriall engaged in a wrongful eviction and engaged in tenant harassment against both Duncan and Mendoza. After damages were

11

trebled under the Rent Ordinance, Duncan and Mendoza were awarded a total of $3,528,000.

After entry of judgment, the landlords filed a motion for a new trial and a motion for judgment notwithstanding the verdict (JNOV). Following a hearing, the trial court denied the motions but concluded that the damages awarded were excessive. The court thus amended the judgment and reduced the tenants' total recovery to $2.7 million.

The landlords appealed from the judgment, and the tenants cross-appealed from the amended judgment.

## II.
### DISCUSSION

The jury found the landlords liable for two separate violations of the Rent Ordinance.[2] The first was a violation of the owner move-in provision, which allows a landlord to evict renters from a unit so long as the landlord uses or occupies the unit "as his or her principal residence for a period of at least 36 continuous months." (Admin. Code, § 37.9, subd. (a)(8)(i).) If a landlord "recovers possession of a rental unit in violation of [the Rent Ordinance] the tenant . . . may institute a civil proceeding for injunctive relief, money damages of not less than three time actual damages (including damages for mental or emotional distress . . . ), and whatever other relief the court deems appropriate." (Admin. Code, § 37.9, subd. (f).) The second violation was of a provision barring landlords from harassing tenants. (Admin. Code, § 37.10B.) A tenant who has been unlawfully harassed by his or her landlord may institute a civil proceeding and, depending on the

---

[2] Jurors were provided with the relevant portions of the ordinance, which was amended around the time of trial. We generally cite to the version of the Rent Ordinance that was provided to the jury.

12

circumstances, be awarded injunctive relief, actual damages and damages for emotional or mental distress—all of which may be trebled, plus reasonable attorney fees.  (Admin. Code, § 37.10B, subd. (c).)

On appeal, the landlords argue that the judgment must be reversed for a host of reasons, including alleged evidentiary and instructional errors, an insufficiency of the evidence, improprieties in closing argument, and errors in calculating and awarding excessive damages.  We discuss each of these arguments below, and we reject them all.

### A. The Trial Court Did Not Abuse Its Discretion by Admitting Evidence of the Landlords' Conduct at Other Properties.

#### 1. The Landlords' Pretrial Motions.

Before trial, the landlords moved to exclude as unduly prejudicial evidence regarding their ownership of rental properties besides the Hill Street building (motion in limine No. 1).  They characterized this evidence as "character evidence" that would be offered "for no purpose other than to tarnish and to characterize the defendants as bad, evil, unreasonable landlords and [that would be offered] by way of introducing testimony from witnesses who have no relationship at all to Hill Street."  In response, the tenants argued that the evidence was relevant to show the landlords' pattern of bad faith, harassment, and wrongful evictions.  At the hearing on the motion, the tenants' counsel indicated that residents of other properties would be called to testify about the harassment in this case, and to testify that Kihagi attempted to evict renters under the related move-in provision for family members at multiple properties.

The landlords also moved more generally to exclude "character evidence" (motion in limine No. 12).  They asked the trial court to prohibit all of the tenants' "fact and expert witnesses from arguing, referring to, or

13

otherwise soliciting or offering into evidence any character evidence regarding the conduct of the" landlords. The motion, however, did not refer to any particular witness. Instead, the landlords argued that witnesses should be prohibited from testifying about Kihagi's "reputation, general behavior, conduct, and character," and the tenants should not be permitted "to taint Kihagi's reputation by introducing or proffering evidence of Kihagi's conduct and character in prior, unrelated, historic dealings and events."

The trial court denied motion in limine No. 1, concluding that excluding all evidence about other properties would be "too extreme" before all the facts were known. At the same time, the court cautioned that it might not allow all of the tenants' proposed witnesses to testify and that its ruling would be subject to any later objection under Evidence Code section 352.[3] The court indicated it would revisit the issue after the tenants testified, when they would "have a better scope of what is at issue."

The court issued a similar ruling on whether character evidence would be admitted. It stated that "evidence that goes to establish intent and bad faith or recklessness, not necessarily pattern and practice, but as specifically defined in the statute [§ 1101, subd. (b)] with regard to the intent of a particular defendant is fair game." The court therefore denied motion in limine No. 12, subject to objections under section 352 "[i]f we're starting to get duplicative or having multiple witnesses and we've covered the issue."

---

[3] The statute provides that a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of under prejudice, of confusing the issues, or of misleading the jury." All statutory references are to the Evidence Code unless otherwise specified.

14

Before opening statements, outside the presence of the jury, the trial court summarized several issues that had been discussed off the record, including the following: "We talked about the scope of the trial and whether [two other residents of the tenants' building] will be allowed some leeway in their testimony, or if it should be strictly circumscribed to lead to type of evidence with regard to the [tenants'] allegations. [¶] The Court's view is I'm not going to impose a bright-line rule, but I've indicated to the parties that a [section] 352 analysis has already begun and will be applied throughout the trial; that it needs to be one of proportionality; that the focus of the case needs to be Mr. Duncan and Ms. Mendoza; and that the amount of testimony elicited from [other tenants] should be substantially less than those two plaintiffs; that openings of the door could affect what comes into evidence; that we're all trying to avoid having a trial within the trial or a non-bifurcated presentation. [¶] And to the extent that some testimony is given by [the two other residents of the Hill Street building], that does not necessarily open a massive cross-examination or a massive redirect which would just basically avoid what we're all trying to accomplish."

On appeal, the landlords claim that these rulings impermissibly permitted various witnesses to testify about the landlords' character. We separately address, and reject, their contentions.

### 2. The Landlords Mischaracterize the Effect of the Trial Court's Rulings.

The landlords first argue generally that the trial court "transformed the trial from an owner move-in eviction involving [Duncan and Mendoza] and their sole residential unit into a trial about [the landlords'] conduct at properties throughout the City and beyond." This is a vast overstatement that does not accurately characterize the trial.

15

It is true that, as we discuss below, the tenants were permitted to support their claim of the landlords' bad faith and pattern of harassment by presenting evidence that the landlords owned other properties. In the first argument section of their opening brief, the landlords do not directly challenge any particular ruling but instead argue broadly that evidence of other properties was "devastatingly prejudicial" to them. They begin by pointing to various references in counsel's opening statement to the landlords' other properties where the trial court overruled the landlords' objections.[4] At one point the trial court admonished the jury that opening statements are not evidence but merely a preview of what each attorney believes the evidence will show. On appeal, the landlords claim that "the admonishment nonetheless suggested that evidence about [the landlords'] bad conduct at properties other than Hill Street would be forthcoming thereby impinging, if not outright destroying, the character of each appellant without regard to their conduct in this case or proof of the accusations against them." Again,

---

[4] The tenants' attorney asserted during his opening statement, "This is [a] case about right and wrong, about following the agreed-upon rules and about the damage caused when you do not. [¶] The defendants own approximately 10 apartment buildings in San Francisco, totaling more than 50 units." Defense counsel objected under section 352 and also objected that the statement was improper because it "goes to the financial net worth." The trial court overruled the objection, and the tenants' attorney went on to state that the landlords purchased the 10 buildings during a two-year period starting in June 2013, and that the landlords harassed their tenants and evicted them from their rent-controlled units, which meant they achieved financial gain at the expense of tenants and gained an advantage over other San Francisco property owners. Counsel then explained that Duncan and Mendoza were tenants in one of those buildings and that the evidence would show they were the victims of the landlords' harassment, intimidation, retaliation, and wrongful eviction.

this is an overstatement, and the landlords do not specify any legal error in the trial court's rulings on opening statements in any event.

The landlords claim that by allowing evidence of the landlords' other properties to demonstrate bad faith, the trial court "injected into the proceeding evidence of [their] 'intent' or knowledge' of their wrongdoing." They argue that this was improper because the Rent Ordinance does not require proof of scienter. They are mistaken. As the jury was instructed, in order to find that Mwangi wrongfully evicted the tenants under the owner move-in provision, jurors had to conclude that Mwangi recovered possession of the unit "in bad faith or with ulterior reasons or without honest intent." (See Admin. Code, § 37.9(a)(8); see also *Reynolds v. Lau* (2019) 39 Cal.App.5th 953, 964 [terms serve specific function to determine whether owner harbors "a good-faith desire to occupy the apartment as his or her primary residence on a long-term basis"].) Similarly, in order to find that the landlords harassed the tenants, jurors were required to find that the landlords "acted in bad faith." (See Admin. Code, § 37.10B(a).)

The landlords rely on isolated language from this court's opinion in *Balmoral Hotel Tenants Assn. v. Lee* (1990) 226 Cal.App.3d 686 (*Balmoral*) that does not support their position. In *Balmoral*, the court concluded that the Rent Ordinance's provision allowing for trebling of "actual damages" did not include damages for mental anguish. (*Id.* at pp. 690–691.) In a footnote, the court observed that the Rent Ordinance does not condition the trebling of damages on the presence of malicious or willful intent, and violations "do not always involve reprehensible conduct" and "may have a technical character" or "may be committed by a landlord who relies in good faith on mistaken legal advice." (*Id.* at p. 695, fn. 4.) But the court did not hold, as the

17

landlords suggest, that evidence of wrongful intent is *never* relevant in a suit under the Rent Ordinance.

In an apparently contradictory argument, the landlords next acknowledge that the tenants had to prove bad faith, but they contend that evidence of their conduct at other properties "could not establish harassment because [the tenants] were not tenants at properties other than Hill Street." This argument simply ignores the tenants' contention that evidence of other properties was necessary to show that the landlords had a pattern and practice of mistreating their tenants. We reject the landlords' argument that the focus of the trial became "a referendum about conduct having nothing to do with Hill Street."

We next address the landlords' arguments about specific testimony that was admitted.

### 3. The City's Attorney Who Testified Did Not Offer Improper "Character Evidence."

#### a. Additional Background.

Michael Weiss, an attorney with the code enforcement division at the City Attorney's Office, was present at the March 4, 2015 task force inspection of the Hill Street building. He testified at trial about his role in the inspection. He also testified about the inspection that day of two other properties owned by Kihagi, as well as two additional buildings that were inspected the following day (a total of five properties).

Weiss testified that he was last present at the Hill Street property in August or September 2016 in connection with a court-ordered discovery inspection. When asked whether inspectors were allowed to enter the property under the court order, Weiss testified that Kihagi's attorney (who continued to represent Kihagi at the time of trial and was present in the

18

courtroom during Weiss's testimony) told inspectors they could not enter. That same defense attorney objected that Weiss's testimony "misstate[d] the record," was "beyond . . . anything relevant to this case," and "also was nonresponsive and a blurt-out by the witness to cast aspersion[s] on defendants." Outside the jury's presence, the tenants' attorney explained that he planned to ask Weiss whether he saw any evidence Mwangi was living at the property because that was the day Mwangi claimed to have moved in. The trial court said the testimony was relevant but was concerned that the defense attorney would become involved in the trial as a percipient witness. The landlords' attorney objected that the inspection had been for a separate purpose and that the tenants were "expanding it into the OMI [owner move-in] issues." The attorney also complained that the trial court had not allowed a section 402 hearing to determine whether Weiss knew whether Mwangi was occupying the tenants' former unit. The trial court stated that the tenants' attorney would be allowed to lay a foundation with Weiss.

When direct examination resumed, Weiss testified that he did not see from the street any evidence of Mwangi living in the tenants' former unit during the 2016 visit, and that they could not get inside the building.

On cross-examination, the landlords' attorney focused on why a task-force inspection was initiated, and an attorney from the City Attorney's Office was present to object to any questions that might invade the attorney-client privilege. At one point defense counsel asked Weiss whether it was true that when he first heard about the Hill Street property there were no prior complaints about code violations there, and Weiss answered, "Well, the code violations and the harassment we had already heard about were from other buildings, so this is the first—," at which point defense counsel interrupted

19

and told Weiss "to focus just on Hill Street." Weiss explained that the first report about issues at Hill Street were not "out of the blue." Defense counsel again cautioned "not [to] talk about other properties." But defense counsel continued to ask about whether "the very first step" in a task-force inspection was to identify code violations and whether inspectors "search[] for code violations" versus "inspecting based upon the complaints of tenants." Weiss respondent that "this Hill Street property was the fourth or fifth property being complained about. [¶] So what I'm telling you is that when we are determining when and which properties to inspect, we are looking at several properties which we had already received complaints about owned and operated by the same person." Defense counsel then asked whether it was true that the City Attorney's Office had not received complaints about "code violations" at the Hill Street property, and Weiss responded that "I couldn't tell you specifically where I got what information I got regarding code violations. [¶] There w[ere] allegations of tampering with mailboxes, removing mailboxes, fiddling around with different systems. [¶] I don't recall specifically because there were so many other complaints; that this property was put on our task force inspection because of the complaints being made by tenants there and also because we had reason to believe that there w[ere] problems at the property and that's what we went to see."

b. Analysis.

Section 1101, subdivision (a), provides that evidence of a person's character is inadmissible to prove the person's conduct on a specific occasion. But subdivision (b) of the statute provides that evidence that a person committed a crime, civil wrong, or other act may be admissible to prove motive, opportunity, intent, or other facts besides the person's disposition to commit such an act. The landlords argue that the trial court abused its

20

discretion by allowing Weiss to offer character evidence under section 1101, subdivision (b), to prove intent, but this argument is misplaced because they do not identify any such purportedly inadmissible testimony.

The landlords begin with the unsupported contention that the reason the tenants called Weiss to testify "was perhaps . . . Machiavellian: to destroy Appellants' character through a witness acting under color of law investigating purported code violations at Hill Street and other properties managed by [Kihagi]." They then devote several pages of their opening brief to summarizing various portions of Weiss's testimony that were admitted over their objections but do not provide any legal reason why their objections should have been sustained. Weiss was a percipient witness to the City's task force inspection of the Hill Street property, and his testimony corroborated Duncan's testimony that a security detail tried to block access to the building.

At one point Weiss was asked whether Duncan initiated the City's investigation of Kihagi, and Weiss testified that he did not and that Duncan's role was that of a "complaining witness." The tenants' attorney then asked Weiss how many complaining witnesses there were, and Weiss testified over a relevancy objection that there were between 10 and 15. On appeal, the landlords claim that they were prejudiced by this testimony because it "strongly, but needlessly, suggested to the jury that many other non-Hill Street tenants were harmed by the monolithic 'Defendants[] even though no evidence was presented at trial that either [Kihagi, Mwangi,] or Zoriall had harmed these folk. . . . Not only was such testimony . . . not relevant to this case, it was pure character assassination which is prohibited by Evidence Code section 1101(a)." Again, Weiss was not testifying about Kihagi's character. As discussed further below, the landlords tried to depict Duncan

21

as an overly sensitive tenant who did not appreciate that landlords have the right to evict people who do not follow their rules. Weiss's testimony that tenants of other buildings also complained was relevant to counter this narrative.

In any event, Weiss's brief reference did not amount to the degree of prejudice the landlords claim on appeal. They contend that the testimony led jurors to ask a question about whether "the Hill Street disruptions fit or match the disruptions at other locations that Anne Kihagi owned or managed." But jurors may in fact have been curious about the topic after defense counsel elicited extensive testimony on cross-examination about complaints received from tenants at other buildings. And jurors' questions to Weiss focused mostly on the actions of the security guards present at the Hill Street property on the day of the task-force inspection.

Finally, we disagree with the landlords' contention that "the trial became an absurdity" on cross-examination because of privilege objections. The landlords complain that the City's privilege objections "prevented [them] from obtaining any meaningful testimony from Weiss [and] lead [*sic*] to the appearance that the information [they] sought . . . was improper." But as they do not point to any supposedly improper objection or offer any legal argument there was error, these arguments are forfeited and we need not further address them.

### 4. Residents of Two Other Properties Likewise Did Not Offer Improper "Character Evidence."

For reasons similar to those for rejecting the landlords' objections to Weiss's testimony, we reject the landlords' arguments that the trial court abused its discretion by allowing residents of two other properties owned by Kihagi to testify.

22

## a. Additional Background.

The first such witness to testify was a tenant of a building on Eureka Street in San Francisco who had lived in his unit since 1995. Kihagi tried to change the terms of his tenancy shortly after she became his landlord, as she had tried with Duncan and Mendoza shortly after she became their landlord. He and other residents were told they had to remove items from an area they had used as storage for years, their garbage service was halved, and they received new house rules. The tenant testified about Kihagi harassing him by claiming she didn't receive a rent payment he made and by questioning the tenancy of his husband. Kihagi's sister (not appellant Mwangi) received an interest in the limited liability company that owned the building and then initiated an owner move-in eviction. The tenant decided not to fight the eviction and moved out of the unit.

The transcript of the direct examination of the witness spans 22 pages. By contrast, cross-examination spans 53 pages and covers defense counsel's questioning of whether the tenant truly felt harassed by Kihagi's statements and actions. On redirect, the tenants' counsel asked whether the tenant was aware of Kihagi's practices at other buildings. The tenant testified over a relevancy objection that he was "very much" aware of her practices because he had done "a lot of sleuthing on the internet" and learned that Kihagi had "similar approaches in West Hollywood, Los Angeles." And when the tenant was asked what he knew about Kihagi, he testified over hearsay and personal knowledge objections, "She's a sociopath. She doesn't follow through—she doesn't follow the City's—she doesn't follow the rules. She—again, the pattern of harassment, whether it be from us, other tenants in the building, tenants throughout the City, tenants in the City's case, it's well known that she is not following [the] City's rules."

The other tenant who testified was a 73-year-old disabled woman who had lived in her apartment on Guerrero Street for 49 years. Kihagi bought the building in 2014 and told the tenant that a member of the association that purchased the building wanted to move in to her unit. The tenant continued to live in the unit, and Kihagi told her to "[f]uck off" when she asked to have a carpet in her unit repaired. The water to the building was shut off because the bill was not paid, and lighting in the common areas also was cut off for around 18 days. Kihagi barred access to the yard that the tenant always had been allowed to use, and blocked access to the side of the building such that garbage collectors could not empty the garbage cans for four weeks, and also blocked access to tenants' mailboxes for a month and a half. Kihagi served the tenant with an eviction notice by "throw[ing] it in [the tenant's] face." Kihagi was unable, however, to evict the tenant. On appeal, the landlords claim this tenant's testimony was offered "to further assassinate Anne's character through the outrageous testimony of an elderly, disabled and biased witness."

b. Analysis.

On appeal, the landlords acknowledge that the trial court admitted the foregoing testimony to show intent and bad faith under the Rent Ordinance, and that the court's ruling is subject to the deferential abuse-of-discretion standard. But they offer no legal or factual reason why the trial court erred. They argue that the court "contravened the policies of section 352 because it failed to recognize that defendants were not a monolith, but rather separate people that would be affected in different ways by the admission of testimony from witnesses who were unfamiliar with the claims of Respondents." But we can conceive of no reason that jurors would be unable to determine the relevancy of the witnesses' testimonies as to each defendant. Likewise, we

24

disagree with the landlords that the trial court's rulings "allow[ed] the trier of fact to become prejudiced against each appellant based on testimony and evidence that had nothing to do with the claims at issue in this case." Again, the evidence showed a pattern of similar harassing behavior against tenants, and the landlords hardly develop an argument over its admission, let alone demonstrate error.

### B. The Landlords Themselves Elicited Testimony About the City's Lawsuit and Thus Identify No Error Regarding Its Admission.

#### 1. Additional Background.

The landlords also moved before trial (motion in limine No. 2) to exclude as unduly prejudicial evidence of other lawsuits against them but involving separate plaintiffs and different properties. At the hearing on the motion, the trial court tentatively ruled that it would bar any reference to the amount recovered in the City's lawsuit, and that witnesses would not be permitted to testify about the case "unless the door is opened for some reason."

On appeal, the only testimony the landlords point to as having supposedly violated the trial court's ruling is testimony that *their* attorney elicited on cross-examination, as follows:

"Q.    Mr. Duncan, do you have any idea how many units Anna Kihagi manages?

"A.    I know in San Francisco, it's probably over 50.

"Q.    Okay. So because a landlord has to evict tenants sometimes for cause or whatever, you think that means she wants all—this is her bread and butter—she wants all her tenants to move out?

"A.    When she buys the buildings and that many people are removed like that, in less than a year—clearly people that lived in their buildings for a

25

long time without ever having had reason to be evicted before, and then suddenly all these tenants are bad tenants that have been good tenants for years for the prior?

"Q.   Mr. Duncan, you have no—do you have any—you don't have any basis for knowing whether any eviction that took place by the defendants had merit or not, do you?

"A.   I read the decision in the City's case and it looked like they deemed all of them—

"[Landlords' counsel]:  Objection, Your Honor.

"The Court:  Basis?

"[Landlords' counsel]:  Motion in limine.

"The Court:  You asked the question.  It opens the door.

"[Tenants' counsel]:  Let him finish.

"[Duncan]:  There was a lawsuit against the landlord by the City, and they ruled every one of the evictions is fraudulent.

"[Landlords' counsel]:  And is that a final judgment in your mind?

"A.   I've heard that it's under appeal.

"Q.   Right.  Exactly.  [¶] So do you know if every one of those evictions that took place was litigated on the merits?

"A.   I know ours was.

"Q.   What—yours was litigated on the merits?

"A.   Well, we testified and I read the decision.

"Q.   Your unlawful detainer was litigated on the merits?

"A.   I don't know what that means exactly in a legal sense, but I know there was four pages of the hundred and 59 page decision dedicated to just us, where it ruled the whole thing as fraudulent."

The next day, the landlords' counsel contended that Duncan had "blurted out, intentionally or not," testimony about the City's lawsuit, which was "devastatingly prejudicial evidence." Counsel asked the trial court to instruct the jury that they should disregard Duncan's testimony about the City's lawsuit, that the lawsuit "is on appeal and has no legal bearing in this case," and that other evictions "ha[d] not been determined [to be] fraudulent." The trial court declined to change its ruling because "there was sufficient questioning on cross-examination of such a breadth that it invited that testimony to be fair game." The court said it would consider a "neutral instruction" on the issue if the landlords presented one, but it declined to immediately give a curative instruction because it did not consider anything to have been erroneously admitted.

2. Analysis.

On appeal, the landlords place the blame for the foregoing testimony on Duncan, his attorney, and the trial court. But we agree with the trial court that the landlords' attorney opened the door to all the testimony that was elicited from Duncan about the City's lawsuit. The landlords contend that "the trial court could easily have instructed the witness to respond to the question [about whether he knew Kihagi's other evictions to be fraudulent] in myriad ways without identifying the [City's] action or its effect on tenant evictions." But a far easier course of action would have been for the landlords' attorney not to have asked the question in the first place, and it was not the trial court's responsibility to stop Duncan from giving a complete answer to defense counsel's question. The landlords have consistently argued that Duncan's testimony about the City's lawsuit was "devastatingly prejudicial." But it is unclear what response the landlords' counsel anticipated that would not have had such an effect. And instead of moving

27

on to another topic after Duncan testified that a court had found other evictions to be fraudulent, counsel continued along this line of questioning, asking Duncan whether the decision was final and whether it had been litigated on the merits.

To the extent that the landlords could legitimately claim the testimony was improper, the trial court offered them the opportunity to offer a neutral instruction for clarification. The landlords acknowledge in their opening brief that they were afforded such an opportunity but do not direct this court to any such proposed instruction, let alone how the trial court ruled on it. They therefore identify no error.

*C. The Landlords' Arguments Regarding Jury Instructions Lack Merit.*

The landlords proposed 22 special jury instructions, none of which were given. The landlords claim on appeal that the failure to give four of these instructions constituted reversible error. We are not persuaded.

1. The Instruction Defining an Owner Move-in Eviction Accurately Summarized the Law.

As we have said, the owner move-in provision allows a landlord to evict renters from a unit so long as the landlord seeks to recover the unit in good faith for the landlord's "*use or occupancy* as his or her principal residence for a period of at least 36 continuous months." (Admin. Code, § 37.9(a)(8)(i), italics added; see also *Reynolds v. Lau*, *supra*, 39 Cal.App.5th at p. 964.) Consistent with this provision, the jury was instructed that in order to find that Mwangi evicted Duncan and Mendoza in violation of the Rent Ordinance, Duncan and Mendoza had to prove that (1) they were tenants in the unit, (2) Mwangi was their landlord, (3) Mwangi sought to recover possession or did recover possession of the unit with bad faith or ulterior reasons, or without honest intent for Mwangi's "*use or occupancy* as her

28

principal residence for a period of at least 36 continuous months," or (4) Mwangi's dominant motive to recover possession of the unit "was not *to occupy*" the unit as her principal residence for at least 36 continuous months. (Italics added.) The landlords argue on appeal that the omission of the term "or to use" in the fourth element materially altered the meaning of the Rent Ordinance and thus did not accurately state the law. They are mistaken.

As a preliminary matter, the landlords did not object in the trial court on the grounds they raise on appeal. True enough, the landlords proposed a different owner move-in instruction that included the term "or to use," and defense counsel told the trial court that he had "quite a few objections" to the instruction proposed by the trial court. The first objection was that the instruction should apply only to Mwangi. The second was that the tenants needed to prove that Mwangi sought to recover the unit in bad faith *and* with ulterior reasons *and* without honest intent (as opposed to *or* without ulterior reasons *or* without honest intent, in the disjunctive). The trial court agreed that the instruction should be limited to Mwangi, but it rejected the second argument. The jury was thus separately instructed on wrongful eviction as to Kihagi and Zoriall. At no point did defense counsel raise the omission of the term "or to use" and the issue was thus forfeited. (*Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 276.)

In any event, the omission amounts to little more than a typographical or otherwise insignificant error. The third paragraph of the instruction included the term "use or," and jurors were provided with a copy of the full text of section 37.9 of the Rent Ordinance, regarding evictions. And the special verdict forms asked jurors to make a finding whether Mwangi's dominant motive in recovering possession of the tenants' unit was "*to use or* occupy" the unit as her principal residence for at least 36 continuous months.

(Italics added.)  We reject the landlords' argument that it was probable the jury was misled.

### 2. The Landlords' Proposed Definition of "Principal Place of Residence" Was Inaccurate.

The landlords next complain that the trial court rejected their proposed instruction that would have defined "principal residence" for purposes of an owner move-in eviction.  Their proposed jury instruction No. 5 stated that the instruction was based on Administrative Code section 12.14(c).  That section currently provides that for purposes of an owner move-in eviction, a landlord can have only one principal place of residence, defined as "the permanent or primary home of the party claiming that a unit has that status attached to it."[5]  The landlords' proposed instruction did not include that definition but instead defined a principal place of residence as "a unit that the party occupies for more than temporary or transitory purposes."  The Administrative Code further provides nine elements that may support a claim of a principal residence, all of which were listed in the landlord's proposed instruction:  (1) the premises are listed as the party's residence on motor vehicle registration, driver's license, insurance policies, and with the party's current employer; (2) utilities are installed in the party's name at the premises; (3) the party's personal possessions have been moved into the premises; (4) a homeowner's tax exemption has been issued in the party's name for the premises; (5) the party's voter registration is for the premises; (6) a U.S. Postal change-of-address form has been filed requesting that the party's mail be forwarded to the premises; (7) the premises is the place the party normally returns to as the person's home; (8) notice to move from

_____

[5] Section 12.14(c) has been amended since trial but this definition has not changed.

another dwelling was given in order to move in to the premises; and (9) the party sold or marketed for sale the home occupied prior to the premises. (Admin. Code § 12.14(c).) The landlords do not direct us to anywhere in the record where proposed instruction No. 5 was specifically discussed or a reason it was not given.

On appeal, the landlords argue that their proposed instruction provided a definition of "principal place of residence" because—according to them—the Rent Ordinance does not define the term. But at all relevant times the Administrative Code has provided that a party may have only one principal place of residence, which is "the permanent or primary home" of the party. (Admin. Code § 12.14(c).) The landlords' proposed definition—that a principal place of residence need only be "a unit that the party occupies for more than temporary or transitory purposes"—was contrary to this definition and appears to be based instead on the Revenue and Taxation Code's definition of "resident" for purposes of the state's personal income tax. (Rev. & Tax. Code, § 17014, subd. (a)(1); *Whittell v. Franchise Tax Board* (1964) 231 Cal.App.2d 278, 283–284.) The cases upon which the landlords rely are thus inapposite, because they focus on different statutory schemes, with different standards to define a pace of residence. (*Burt v. Scarborough* (1961) 56 Cal.2d 817, 818, 822 [determination of residence for purposes of venue]; *Smith v. Smith* (1955) 45 Cal.2d 235, 239–240 [whether party was resident for purposes of in personam jurisdiction]; *Whittell*, at p. 284; *Myers v. Carter* (1960) 178 Cal.App.2d 622, 623, 625 [whether party lived out of state for purposes of having to file an undertaking, Code Civ. Proc., § 1030].)

The trial court did not err in declining to give a proposed instruction that was contrary to governing law.

31

3. The Landlords Have Forfeited Their Argument Regarding Instructing the Jury on Bad Faith.

Finally, we reject as forfeited the landlords' argument that the trial court erred in not providing their two proposed instructions regarding the definition of "bad faith" for purposes of the Rent Ordinance. In their opening brief, they cite to their two proposed instructions but omit any discussion of the trial court's reasons for denying the instructions, let alone any legal support for why the denial amounted to error. (*Lafferty v. Wells Fargo Bank* (2013) 213 Cal.App.4th 545, 571–572 [judgment is presumed correct, and where party fails to address how trial court erred and fails to provide legal authority, point is deemed forfeited and requires no further discussion by the reviewing court].)

*D. Substantial Evidence Supports the Jury's Verdicts.*

The jury found that all three defendants committed wrongful eviction and tenant harassment against both Duncan and Mendoza. On appeal, the landlords contend that various verdicts were not supported by substantial evidence. We again disagree.

1. Sufficient Evidence Supports Mwangi's Liability for Harassment.

The landlords apparently do not dispute that the tenants were subject to harassment as defined by the Rent Ordinance. As the jury was instructed, the ordinance provides that no landlord or agent of the landlord shall do any of several enumerated acts in bad faith, including (1) abuse the landlord's right of access into a rental unit; (2) influence or attempt to influence a tenant to vacate a rental unit through fraud, intimidation or coercion; (3) fail to perform repairs and maintenance required by contract or by law; (4) fail to exercise due diligence in completing repairs; (5) interfere with a tenant's

32

right to quiet use and enjoyment of a rental unit; (6) interfere with a tenant's right to privacy; (7) interrupt, terminate, or fail to provide housing services required by contract or law; or (8) commit other repeated acts or omissions "of such significance as to substantially interfere with or disturb the comfort, repose, peace[,] or quiet of any person lawfully entitled to occupancy of such dwelling unit and that cause, or are likely to cause, or are intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy." (Admin. Code § 37.10B(a)(1)–(a)(5), (a)(10), (a)(13) & (a)(15).)

Abundant evidence was presented at trial that the tenants were deprived of housing services (electricity in common areas, laundry, a parking space, storage, access to the mailboxes, and garbage services), had a water heater that was repaired in a faulty manner, were subjected to repeated abuses of the landlords' right of entry, were deprived of their right to quiet enjoyment of their unit, and were subjected to acts that were intended to cause the tenants to vacate their unit. The landlords contend, however, that there was insufficient evidence to support the jury's finding that Mwangi in particular was liable for tenant harassment. (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188 [jury verdict reviewed for substantial evidence].) We disagree.

The tenants argued to the jury that Mwangi was liable for harassment as a landlord, defined by the Rent Ordinance as an owner "who receives or is entitled to receive rent for the use and occupancy of any residential rental unit" in San Francisco "and the agent, representative or successor of any of the foregoing." (Admin. Code, § 37.2(h).) During closing argument, the tenants' counsel argued that "by law" Mwangi was a manager and agent of Zoriall since she was a member of the LLC and its articles of incorporation

33

stated it would be managed by its members. Counsel argued that Mwangi was liable for the tenants' harassment as a "managing member of the LLC and an owner for part of the time."

On appeal, the landlords focus on the evidence showing little interaction between Mwangi and the tenants. It is apparently undisputed that the only contact the tenants had with Mwangi was when Duncan saw her when she dropped off mailbox keys. But even if this interaction in and of itself did not amount to harassment, it supported a finding that Mwangi was acting as an "agent, representative or successor" of Zoriall and thus fit the definition of a landlord under the Rent Ordinance. (Admin. Code, § 37.2(h).) Although, as the landlords point out, Mwangi may have testified that she had no management responsibilities for the property or for Zoriall, her own testimony supported a finding that she was an agent or representative of Zoriall. She testified repeatedly and consistently that she was an owner of the property, even before the interest in the LLC was transferred to her to establish her as a "natural person" owner eligible for an owner move-in. It was undisputed that she was one of only two members of Zoriall, and at the time of trial she continued to own a 27 percent share in the building. Mwangi does not address this theory of liability in her opening brief except to briefly contend that as an agent, representative, or member of Zoriall, she was immune from liability under Corporations Code section 17703.04, subdivisions (a)(1) and (a)(2), an argument we reject below. (*Post*, § II.D.3.) Mwangi fails to establish error.

> 2. Sufficient Evidence Supports Mwangi's Liability for Wrongful Owner Move-in Eviction.

The landlords next contend that insufficient evidence supports the judgment against Mwangi for a wrongful owner move-in eviction, but they

again fail to satisfy their burden of demonstrating error. "When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review. [Citation.] ' "[T]he power of [the] appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the [verdict]." [Citations.]' [Citation.] We must 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.] Needless to say, a party 'raising a claim of insufficiency of the evidence assumes a "daunting burden" ' [citation], one that simply has not been met in this case." (*Wilson v. County of Orange*, *supra*, 169 Cal.App.4th at p. 1188.)

In their opening brief, the landlords highlight the evidence that supported Mwangi's claim that she had gained possession of the unit in good faith within the past year and intended to occupy it for at least 36 continuous months. But this evidence was contradicted by extensive evidence *supporting* the verdict, such as evidence showing that Mwangi owned a home in Fremont[6] (which is much closer to where she worked in Hayward), that her driver's license and car registrations listed the Fremont address, that she indicated the Fremont property was her primary residence for purposes of refinancing the loan on that property, and that she failed to move into the tenants' former unit when she told the Rent Board she would. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 749 [appellate claim of insufficient evidence waived where appellant fails to set out all evidence that

---

[6] The landlords rely on federal statutes and direct the court to information about a Fannie Mae program and claim this information explains why Mwangi signed for a mortgage loan for the Fremont home even though she did not live there. Even if this information had been presented at trial, which it was not, it would not be sufficient to set aside the jury's verdict.

supports verdict].) Although Mwangi testified that she eventually moved in, it was the jury's duty to weigh Mwangi's credibility and resolve all conflicts in the evidence. Resolving all conflicts in favor of the verdict, we must reject the landlords' substantial-evidence arguments.

### 3. The Corporations Code Does Not Shield Kihagi from Liability for Tenant Harassment.

Again, the Rent Ordinance defines a landlord as an owner entitled to receive rent and the agent, representative, or successor of the owner. (Admin. Code, § 37.2(h).) The jury found that both Zoriall and Kihagi violated the Rent Ordinance provision barring landlord harassment.

The landlords' opening brief includes a section titled "The Corporations Code Bars Liability Against Anne for Harassment Because Her Conduct Was Undertaken on Behalf of Zoriall." (Bold omitted.) They contend that it was Kihagi alone whose conduct amounted to harassment, and that this conduct was done on Zoriall's behalf. The landlords rely on the Corporations Code provision that a company's debts and liabilities belong to the company alone, and they do not become a manager's debts and liabilities *solely* by reason of that member acting as manager for the company. (Corp. Code, § 17703.04, subd. (a)(1) & (a)(2).) The landlords apparently contend that, absent a finding that Kihagi was Zoriall's alter ego,[7] she is shielded from liability under these provisions because she was acting on the company's behalf and did not take on the company's liability by virtue of her membership in the

---

[7] The landlords similarly complain that the tenants' attorney in his rebuttal closing argument to the jury stated that Zoriall and Kihagi were "one and the same" despite the fact that "no such determination was reserved for the trial court and no such finding had been made." But in the absence of a timely objection to the argument, much less a request to admonish the jury, the landlords forfeited this argument. (*Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 319.)

36

company.  But both Kihagi and Zoriall fit the Rent Ordinance's definition of "landlord," and thus they were both separately liable for tenant harassment. We reject the landlords' Corporations Code argument.

        4.  The Landlords' Argument That Insufficient Evidence Supports the Wrongful Eviction Verdicts Against Kihagi and Zoriall Fails.

The landlords next contend that substantial evidence did not support the jury's findings that Kihagi and Zoriall committed wrongful eviction. Again, they fail to meet their burden of demonstrating error.

As the jury was instructed, to establish that Kihagi and Zoriall evicted the tenants in violation of Rent Ordinance section 37.9, the tenants were required to prove that (1) Duncan and Mendoza were tenants of the subject unit, (2) Kihagi and Zoriall were their landlords, (3) Kihagi and Zoriall tried to recover possession of the subject unit, and (4) Kihagi and Zoriall wrongfully tried to recover or did recover possession of the rental unit in violation of section 37.9.  Jurors were provided with a copy of section 37.9, which provides that a landlord shall not try to recover possession of a rental unit unless at least one of 16 conditions applies (e.g., the tenant has failed to pay rent or habitually pays late, has violated a lawful obligation or covenant of tenancy, is committing or permitting to exist a nuisance, or is using the rental unit for an illegal purpose).  (Admin. Code § 37.9(a).)

In their opening brief, the landlords do not challenge any particular element that the tenants were required to prove.  Instead, they summarize the tenants' closing arguments to the jury and their opposition to the motion for judgment notwithstanding the verdict.  The landlords claim that the evidence to which the tenants' counsel pointed in those settings was insufficient to establish a wrongful eviction.  The landlords were required to support their arguments with sufficient legal and factual citations.  (*United*

*Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 156; Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).)  We agree with respondents that the landlords did not meet their duty to fairly summarize all facts in the light most favorable to the judgment, which we presume on appeal is correct and for which all presumptions are indulged to support it.  (*United Grand Corp.*, at p. 146; *Myers v. Trendwest Resorts, Inc.*, *supra*,  178 Cal.App.4th at p. 739; *Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416.)  The landlords fall short of meeting their affirmative duty to show error.

### E. The Tenants' Rebuttal Argument Was Not Reversible Error.

#### 1.  Additional Background.

During the landlords' closing argument, counsel stated, "Now, unfortunately the judge didn't give you every bit of law that we wanted to. Everybody wants to put in as much law as they can into the box.  But the judge decided these are the things I think are relevant, and if you have questions, of course, we could deal with it then."  Counsel then emphasized that the tenants had the burden of proof to establish their claims.  Later, counsel put up a series of slides.  After displaying a slide regarding harassment and arguing that the tenants had not proved bad faith, counsel stated "let's move on," apparently asking for the next slide.  Counsel continued, "Again, this goes through—this goes through what is—" at which point the tenants' counsel objected that "[t]his looks like an instruction that wasn't given.  It's referencing the law," and that "all of these [slides] are argument.  Not legal."  The trial court overruled the objection but instructed the jury that the jury instructions should govern over any conflict with counsel's representations.  Counsel then said that an exhibit showed that the

38

landlords told the Rent Board that construction on the tenants' former unit was going to take longer than anticipated.

The landlords' counsel also displayed a slide regarding what a "red herring" is. She argued that "the way you know it's a red-herring argument is because there's no jury instruction on it and there's really no burden of you to decide it. It was just a fact that was meant to lead you on a wild goose chase into a false trail." Counsel then spent most of the remainder of closing arguing displaying slides with examples of what she considered to be such red-herring arguments. One example was Kihagi's reputation for evicting tenants. Counsel contended that Kihagi's "reputation, her alleged reputation, which was created by the media and the people going to the City Attorney's Office, the people going to the politicians and doing all these things, that's not necessarily the real person. [¶] In fact, this is the first jury trial regarding Anna Kihagi. [¶] Like she said, she wasn't allowed to testify in the other cases, she wasn't—her sisters weren't allowed to testify. This is the first jury trial where you get to actually hear the defendants' side of the story." After a recess, counsel stated that she "just want[ed] to clarify" something that the tenants' counsel "interpreted in a different way." She continued, "When I said that you were the first jury to hear the defendants' side of the story, what I meant was on the issue of tenant—the issues of tenant harassment, about her response to the—to the allegations that she harasses tenants. That's what I meant."

Later, counsel again emphasized that it was the tenants' burden to show that Mwangi did not move into the tenants' former unit, not the landlords' burden to prove that she did. She elaborated, "We didn't need to parade in as many people. We were limited with how many people we could parade in. [¶] So that [the tenants' counsel] would say, 'Well, they should

39

have brought in more people,' they barred us from bringing in Ray Robertson," a reference to someone Mwangi testified was a "real person" with whom she sometimes commuted but who was not permitted to testify at trial because he did not appear for his scheduled deposition. The trial court sustained an objection from the tenants' counsel. The landlords' counsel countered that "You [the trial court] did bar us," then again argued that Robertson was not able to testify, at which point the trial court again sustained an objection.

Still later, after counsel apparently displayed a slide about bad faith, the following exchange took place:

"[Landlords' counsel]: Okay. So bad faith is one of those things that's so important for you to look—when you look at this jury instruction; right? It's not that something happened—

"[Tenants' counsel]: Objection, Your Honor. This is not a jury instruction.

"THE COURT: Sustained.

"[Tenants' counsel]: She's misrepresented—can they take it down? It's her made-up thing.

"[Landlords' counsel]: I thought we could talk about—

"[Tenants' counsel]: You just said it's not a jury instruction.

"[Landlords' counsel]: No, I didn't. I said the bad faith—

"[Tenants' counsel]: No. You just said it was a jury instruction.

"THE COURT: It's not a jury instruction.

"[Landlords' counsel]: It's not a jury instruction.

"THE COURT: So let's move on from the argument, please."

The landlords' counsel then argued that the tenants had to prove that harassment was done in bad faith and that negligence did not amount to bad

40

faith. She contended that the fact that Duncan's water heater may not have been timely repaired was not evidence of bad faith and questioned why Duncan did not find an "easy way" to get the water heater fixed. The following exchange then took place:

"[Landlords' counsel]: But instead, he's saying because she—the services were cut off, it has to be in bad faith. All right? [¶] So not only—okay. So that's a requirement. Bad faith also has to be—

"[Tenants' counsel]: Objection Your Honor.

"THE COURT: I'll sustain the objection.

"[Tenants' counsel]: It's not a requirement.

"[Landlords' counsel]: The requirement to meet—

"[Tenants' counsel]: He just sustained my objection.

"[Landlords' counsel]: The requirement to meet–

"THE COURT: Counsel, I'm going to allow you to argue it, but it's not—other than the first sentence, I'm not going to allow you to expound upon it."

The tenants' attorney later objected to an "[i]mproper jury instruction" during argument about damages, and the trial court instructed jurors to "follow the jury instructions, and the verdict form. I'm going to allow the argument."

At the beginning of rebuttal argument the following morning, the tenants' counsel said he had been bothered by the landlords' closing argument because after he spent four weeks presenting evidence, putting together accurate jury instructions and verdict forms, and presenting what he thought was a fair closing argument, the landlords' attorney "put up her fake jury instructions. She did her own jury instructions, which aren't the law. It wasn't the law. It was misleading." After the trial court overruled a

defense objection, counsel continued without further objection, "Misleading. That's what bothered me. [¶] Then she put up 32 or 33 points of fake evidence, mischaracterizing things. [¶] You guys heard the evidence. You sat here for three to four weeks and heard the evidence and saw the evidence. And then the fake evidence."

The landlords' attorney then turned to defense counsel's assertion that this trial was the first time the landlords had been allowed to tell their side of the story, stating that the attorney "told you that they were happy, Anna Kihagi, Christina Mwangi were happy because they finally get a jury to tell their story to. First time[,] she says. The other time, they weren't allowed to—they weren't allowed to testify in that other case. This is what she told you. [¶] Not true. Simply not true." The landlords' attorney objected that the tenants' attorney "wasn't at the trial" and that he "knows they weren't allowed to testify." The trial court ruled that "the door has been opened" but directed the tenants' attorney to "keep it brief on this." Counsel continued, "I'm not talking about that case, Judge. I'm talking about the two cases they lost before a jury. The eviction attorney and the defendants brought an eviction against a retired woman. Of all the bogus allegation. They impaneled—." The trial court then overruled another defense objection. The tenants' counsel continued, "[They impaneled a jury] of 14 people just like you guys who sat here for a few weeks. They got up and testified. The tenant said, 'Oh, they're doing all the same things [Duncan] and [Mendoza] said.' And you know what, they had their day in court. And you know what, they lost." The trial court then sustained a section 352 objection. Counsel continued, "Happened another time as well. They had—they had two times. They had two other juries that they spent that time with, and I bet they put

42

the fake jury instructions up as well.  That's what bothered me."  The trial court then sustained a speculation objection.

Later, counsel responded to defense counsel's argument that jurors could not find harassment based on the three-day eviction notice because it was allegedly "constitutionally protected conduct" covered by the "litigation privilege."  The tenants' attorney asserted without objection, "The fact that Defendant Kihagi and her eviction attorney issued a three-day notice nuisance eviction against [Duncan], that was after—after the owner move-in notice, after that.  [¶] That that somehow protects them from all their wrongful conduct here, that is not the law.  [¶] Look for the judge's instruction about it.  You'll find none.  All those fake instructions she put up there yesterday, look for them in the judge's instruction.  None are there.  None."

2. Analysis.

The landlords argue on appeal that the tenants' "inflammatory" rebuttal argument warrants reversal of the judgment.  Again, we are unpersuaded.

"In conducting closing argument [in a civil trial], attorneys for both sides have wide latitude to discuss the case.  ' " ' "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he [or she] has the right to state fully his [or her] views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom.  The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury." ' " ' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795.)  " ' "An attorney is permitted to argue all reasonable inferences from the evidence, . . ." [Citation.]  "Only the most persuasive reasons justify handcuffing attorneys

43

in the exercise of their advocacy within the bounds of propriety." ' " (*Ibid.*) An attorney who exceeds this wide latitude—such as by assuming facts not in evidence, inviting the jury to speculate as to unsupported inferences, or making personally insulting or derogatory remarks directed at opposing counsel—commits misconduct. (*Id.* at p. 796.)

As to the arguments to which the landlords did not object below, they forfeited any claim that they constituted misconduct. (*Sabella v. Southern Pac. Co., supra*, 70 Cal.2d at p. 319.) The landlords also have failed to provide an adequate record to demonstrate error. (*Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435 [appellant defaults if appellant fails to provide portions of proceedings below that may provide grounds upon which decision could be affirmed].) For example, the landlords suggest that the argument they presented "fake jury instructions" "appear[ed]" to be based on counsel "inadvertently characterize[ing] the Rent Ordinance as a jury instruction." But the slides to which the landlords' attorney referred during closing argument are not part of our record, and without them we cannot fairly evaluate the claim. Counsel stated, "Regarding—okay. So let's talk about this harassment statute. [¶] Can you bring up the harassment statute–well, actually *bring it back*. [¶] Bad faith is something that is—there's two causes of action here, two questions of—regarding—in this case." (Italics added.) It may be that instead of displaying the Rent Ordinance, counsel was asking her assistant to "bring [another slide] back." Without the relevant slide, we have no way of determining whether defense counsel simply misspoke about whether the Rent Ordinance was a jury instruction, as the landlords now claim, or whether she was in fact displaying a definition of bad faith that purported to be a jury instruction.

In any event, the landlords have fallen far short of establishing that the tenants' reference to "fake jury instructions" was so "outlandish" that it warrants a new trial. Furthermore, even if we were to find attorney misconduct, which we do not, there was no prejudice. "In determining prejudice, we evaluate the following factors: '(1) the nature and seriousness of the misconduct; (2) the general atmosphere, including the judge's control of the trial; (3) the likelihood of actual prejudice on the jury; and (4) the efficacy of objections or admonitions under all the circumstances.' " (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 296.) Under this standard, the landlords cannot possibly establish prejudice. Their trial attorney argued in closing that a jury "get[s] to actually hear the defendants' side of the story" after previously not being allowed to testify. This made it sound as if the landlords welcomed their day in court, without the context that this was a possible reference to the fact that they had been barred from testifying in the City's lawsuit because of their egregious and repeated discovery abuses. Instead of objecting in front of the jury, the tenants' counsel apparently raised the issue on a break, permitting the landlords' attorney to "clarify" that she had been referring only to testifying about tenant harassment. Defense counsel also told jurors that they should not hold it against the landlords that they did not call more witnesses since they had been barred from calling a person with whom Mwangi claimed to commute, omitting the fact that the person was barred from testifying because he had not appeared for a deposition. The fact that defense counsel would mischaracterize the record through omission supports the notion that counsel was displaying misleading slides as well, as the tenants' counsel claimed. It may be that the response of the tenants' counsel was imperfect, but a review of the entire closing arguments reveals that there was no likelihood of prejudice to the jury.

45

*F. There Is No Reason to Set Aside the Damages Awarded in the Amended Judgment.*

In their appeal, the landlords argue that an unqualified expert improperly computed the tenants' damages and that the amended judgment was confiscatory. In their cross-appeal, the tenants disagree and contend that the trial court arbitrarily reduced the damages. We reject both sides' arguments.

1. Additional background.

a. Testimony of Expert Richard Devine.

Richard Devine, the chairman of a real estate finance and development company, testified for the tenants as a damages expert. Devine has been in the industry since the early 1970s, and his current work focuses almost exclusively on multifamily rental properties in several western states. His company has financed around 1,300 units in San Francisco. The landlords did not object to Devine's ability "to render opinions on the financial and economic issues of this case," and the trial court permitted the tenants to question Devine as an expert in the field of real estate finance.

Devine first opined on how much the tenants suffered by losing their tenancy in a unit subject to rent control and having to find a similar replacement unit at a much higher rent. They were paying $15,384 per year ($1,282 per month) in rent at the time they lost their tenancy, whereas the market rate for the unit was $52,800 per year ($4,400 per month). This meant there was a "differential" at the time of displacement of $37,416, meaning that was the annual amount they were forced to pay in market rates over what they had been paying. When Devine began testifying about rent differentials, the landlords objected on relevancy and section 352 grounds that because the Rent Ordinance limits damages to actual damages,

differential damages were irrelevant.  The trial court overruled the objection as it went to weight and not admissibility.

Devine calculated the differential for the time following the tenants' displacement using the following estimates.  Had the tenants been able to stay in their unit, the maximum the rent could have been increased was 1.6 percent the first year, and 2.2 percent the following year.  Going forward, Devine estimated that the rent could be increased annually by 2 percent, which was higher than the historical average.  For the market rent, Devine increased it for 2016–2017 to $4,500 per month, then kept it the same since the market was "kind of flat" at the time of trial (fall 2017), then estimated it would rise 5 percent per year thereafter.  Using those figures and estimates, Devine opined that $38,370 was the differential for the second year of displacement, and a little less than that for the third year of displacement.

Devine opined based on his experience with rent-controlled units and an interview with Duncan that the tenants would have remained in their unit for at least another 21 years.  Within 10 years, the cumulative differential between the tenants' unit and market rate would be $454,333.  After 20 years, the cumulative differential would be $1,252,000.  Devine opined that to calculate the value of the loss from the tenants' eviction, he would take that $1,252,000 figure and reduce the amount to its present value as of the time the tenants were displaced, using the yield on a comparable maturity treasury obligation.  Using 2.62 percent, the yield on a 20-year treasury at the time of displacement, Devine discounted the amount to $920,779, the net present value.  The net present value after five years would be $188,098, after 10 years it would be $401,280, after 15 years it would be $651,292, and after 20 years it would be up to the full $920,779.

### b. The Jury's Verdict.

The jury found that Kihagi, Mwangi, and Zoriall were each liable to Duncan and Mendoza separately for $196,000, composed of damages for both wrongful eviction and harassment. For wrongful eviction, the amount included $150,000 in lost rental value and $30,000 for mental or emotional damages. For harassment, the amount included $1,000 in lost rental value and $15,000 for mental or emotional damages. This meant that Duncan and Mendoza were each awarded $588,000 in damages (for a total of $1,176,000).

After the damages were tripled under the Rent Ordinance (Admin. Code §§ 37.9, subd (f), 37.10B, subd. (c)(5)), total damages awarded were $3,528,000.

### c. Post-trial Proceedings.

In their motion for a new trial, the landlords argued that the amount of damages was excessive. (Code Civ. Proc., § 657, subd. (5).) They argued that the trebled damages were punitive in nature, the total amount of the award violated due process because it exceeded the value of the Hill Street property, and the award was far greater than the tenants' "actual damages" contemplated under the Rent Ordinance. (Admin. Code, § 37.10, subd. (f).) They argued that the correct amount of the tenants' actual damages should have been the difference between the rent the tenants paid at their old unit and the actual rent at their new unit, as opposed to the difference between their previous rent and market-rate rent. The landlords further contended that Devine's estimate of future market-rate rent increases of five percent was "highly speculative, unsupported by data, and beyond [the tenants'] actual damages given its inaccuracy."

The trial court denied the motion for a new trial, but concluded that the total damages awarded after trebling was excessive. The court reduced the

award and amended the judgment so that total damages awarded was $2.7 million. The trial court's award did not question Devine's damages calculations or state they were improper.

### 2. The Landlords' Appeal: The Damages Awarded Were Not Miscalculated and Are Not Confiscatory.

To the extent that the landlords argue that the tenants were not entitled to "rent differential" damages under the Rent Ordinance, we reject their arguments. The ordinance provides that a tenant may recover money damages of not less than three times "actual damages," including damages for mental or emotional distress if the trier of fact makes a finding regarding intent, both when a landlord is found to have committed an unlawful eviction (Admin. Code § 37.9(f)) or tenant harassment (Admin. Code § 37.10B(c)(5)). The ordinance does not define the term "actual damages."

Division Two of this court recently considered, and rejected, arguments that Devine's similarly calculated "rent differential" measure of damages was not recoverable as "actual damages" under the Rent Ordinance. (*DeLisi v. Lam* (2019) 39 Cal.App.5th 663, 680–681.) The court held that the "actual damages" permissible under the Rent Ordinance is not expressly limited to out-of-pocket losses. (*Id.* at p. 681.) " ' "Damages" are monetary compensation for loss or harm suffered by a person, or certain to be suffered in the future, as the result of the unlawful act or omission of another. ([Civ. Code,] §§ 3281–3283.) "Actual" is defined as "existing in fact or reality," as contrasted with "potential" or "hypothetical," and as distinguished from "apparent" or "nominal." (Webster's Third New Internat. Dict. (1964) p. 22.) It follows that "actual damages" are those which compensate someone for the harm from which he or she has been proven to currently suffer or from which the evidence shows he or she is certain to suffer in the future. They are to be

49

distinguished from those which are nominal rather than substantial, exemplary or punitive rather than compensatory, and speculative rather than exiting or certain. [Citations.] In short, " ' "[a]ctual damages" is a term synonymous with compensatory damages' " ' " (*Ibid.*)

The landlords' reliance on *Castillo v. Friedman* (1987) 197 Cal.App.3d Supp. 6 is misplaced. *Castillo* was an action brought under Los Angeles's Rent Stabilization Ordinance for wrongful eviction. (*Id.* at p. Supp. 10.) Following a bench trial, the plaintiff was awarded $5,856 in compensatory damages, calculated as the difference between what the plaintiff was paying on her rent-controlled apartment and the market rental value of the unit, plus storage costs because she moved to a smaller apartment, for the two years she would have occupied the premises. (*Id.* at pp. Supp. 10, 20.) The appellate department of the superior court concluded that there was insufficient evidence to support the market rental value of the unit used to calculate damages, because the trial court used the figure the landlord hoped to collect in rent, and not a figure that was ever actually collected. (*Id.* at pp. Supp. 20–21.) Here, by contrast, Devine based his opinion of the market rate from data on San Francisco rents that has been collected by a firm called Real Facts since the 1980s. The firm conducts quarterly surveys based on about 25,000 units and produces a report for San Francisco as a whole.[8]

True enough, in *Balmoral*, *supra*, 226 Cal.App.3d 686, this court defined actual damages "as referring narrowly to out-of-pocket expenses." (*Id.* at p. 690) The court thus excluded mental-suffering damages from the

---

[8] The landlords claim that Devine's calculation of fair market value was incorrect because of various discrepancies, including that it was based on a unit with two bedrooms and one bathroom, whereas the tenants' unit had one bedroom, one bathroom, and an "extra room." These questions were for the jury to decide.

definition because they "involve[] considerable variability." (*Id.* at p. 691.) The court considered this interpretation consistent with the legislative purpose of providing for treble damages because " 'lawsuits over wrongful evictions are likely to involve small amounts of money that may not justify the costs of litigation.' " (*Id.* at p. 690, quoting *Kelly v. Yee* (1989) 213 Cal.App.3d 336, 341.) But the ordinance was amended following *Balmoral* to provide for emotional distress damages when certain findings are made, an indication this court did not accurately divine the legislative intent of treble damages. And rent-differential damages "are not uncertain in the way or to the same degree as damages for emotional distress." (*DeLisi v. Lam*, *supra*, 39 Cal.App.4th at p. 685.)

The landlords' remaining arguments over the rent-differential evidence essentially question whether there is substantial evidence to support the damages awarded. (*Wilson v. County of Orange*, *supra*, 169 Cal.App.4th at p. 1188.) For example, in a section of their opening brief claiming that Devine's estimate of future market-rate rent increases of five percent was speculative and unsupported by the evidence, the landlords cite to their own motion for a new trial to claim that the trial court supposedly "rejected [the tenants'] measure of damages." They also misleadingly quote Devine's testimony to make it seem as if he believed demand for San Francisco housing was dropping, when in fact he testified that there are reasons housing supply does not keep up with demand. This does not amount to a showing that the damages awarded lacked substantial evidence. The same goes for the landlords' argument that Devine was not qualified to opine on how long the tenants would have remained at the Hill Street property. This was a jury question, and the landlords do not meet their burden to show error.

The landlords next contend that even after the trial court reduced the judgment, the damages awarded were confiscatory and violated due process. We disagree. It is true that where a statute is constitutional, it may still under certain circumstances produce constitutionally excessive penalties that must be evaluated on a case-by-case basis. (*Hale v. Morgan* (1978) 22 Cal.3d 388, 404.) The penalty at issue in *Hale* was one that accrued on a daily basis, such that "[t]he exercise of a reasoned discretion [wa]s replaced by an adding machine." (*Id.* at p. 402.) Here, the jury set a fixed amount based on all the evidence before it. And while the landlords are correct that the award was trebled under the Rent Ordinance, the trial court specifically relied on *Hale* to reduce the damages to avoid excessiveness. We reject the landlords' arguments.

> 3. The Tenants' Cross-Appeal: The Trial Court Did Not Abuse
> Its Discretion in Reducing the Damages Award.

In their cross-appeal, the tenants argue that the trial court abused its discretion when it reduced the amount of damages awarded by the jury. We disagree.

It is somewhat unclear what procedure the trial court used to reduce damages. A court has the authority to reduce an award when it is unconstitutionally excessive. (*Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204, 214.) The court's order reducing damages referred to *Hale v. Morgan, supra*, 22 Cal.3d 388, which considered whether a trial court had awarded constitutionally excessive penalties. But as the tenants point out, Code of Civil Procedure section 662.5, subdivision (a)(2), contemplates that the trial court should have issued an order granting a new trial conditioned on the tenants' consent to the reduction of damages, as opposed

to denying the motion and reducing damages without giving the tenants an opportunity to accept the reduction as the trial court did here.

Before oral argument, the court wrote to counsel about the remittitur issue. The court essentially asked the tenants whether, if the court were to affirm the jury's liability determination, they would accept the amount awarded in the amended judgment rather than face a remand and reconsideration of the motion for new trial. (See *ENA North Beach, Inc. v. 524 Union Street* (2019) 43 Cal.App.5th 195, 215 [although trial court erred in reducing punitive damages by not following the remittitur procedure set forth in section 662.5, counsel stated at oral argument that party would accept reduced amount, enabling court to affirm the judgment in the interest of efficiency and judicial economy instead of remanding].) Responding to the court's questions at oral argument, counsel first reiterated the tenants' request that we 1) set aside the trial court's reduced award and direct that the jury's award be trebled as a matter of law and 2) not remand the case to give the trial court the opportunity to reconsider the motion for new trial. Counsel then explained, however, that the tenants would agree to the reduced award rather than face a remand if we decline to set aside the reduced award.

We conclude that the reduced award should not be set aside. Even though the trial court should have followed the remittitur procedure set forth in section 662.5, we cannot conclude that its reduction of damages was improper. The court's order stated that "the Court considered the disproportion between the size of the judgment and the sort of recovery needed to serve the legitimate purpose of the San Francisco Rent Ordinance." Although the landlords' conduct here was egregious and the verdicts were supported by substantial evidence, the trial court was in the best position to

determine if under the circumstances the original award was "wholly disproportionate" to the Rent Ordinance's goal of compensating harmed tenants.  (*Hale v. Morgan, supra*, 22 Cal.3d at p. 405.)  We see no reason to set aside its amended judgment.

### III.
#### DISPOSITION

Respondents' unopposed request for judicial notice filed on November 25, 2019, is granted.

The amended judgment is affirmed.  Respondents shall recover their costs on appeal.

_____

Humes, P.J.


WE CONCUR:


_____

Margulies, J.


_____

Banke, J.


_Duncan et al. v. Kihagi et al._  A153521

Filed 9/1/21

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DALE DUNCAN et al.,<br><br>      Plaintiffs and Appellants,<br>v.<br><br>ANNE KIHAGI et al.,<br><br>      Defendants and Appellants. | A153521<br><br>(City and County of San Francisco  Super. Ct. No. CGC15545655)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

BY THE COURT:

The opinion in the above-entitled matter filed on August 9, 2021, was not certified for publication in the Official Reports.  After the court's review of two requests under California Rules of Court, rule 8.1120, it is ordered that the opinion should be published in the Official Reports, with the exception of sections II.B., II.C., II.D.3, II.E., and II.F.3., which do not meet the standards under rule 8.1105(c).

Dated:

_____
Humes, P.J.

1

Trial Court:

Superior Court of the City and County of San Francisco


Trial Judge:

Hon. Andrew Y.S. Cheng


Counsel for Defendants and Appellants:

Ryan B. Polk, Edward Romero, Kevin Liu, Gordon Rees Scully Mansukhani, LLP


Counsel for Plaintiffs and Appellants:

Steven J. McDonald, Ariel Gershon, Greenstein & McDonald


*Duncan et al. v. Kihagi et al.* A153521

2